Nathaniel K. Charny
Charny & Wheeler P.C.
9 West Market Street
Rhinebeck, New York  12572
ncharny@charnywheeler.com
(845) 876-7500

Attorneys for Plaintiff Robert Diamond

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROBERT DIAMOND,<br><br>                    Plaintiff,<br><br>-vs-<br><br>NUVANCE HEALTH, HEALTH QUEST SYSTEMS, INC., JOHN MURPHY in his professional and individual capacity, STEVEN ROSENBERG in his professional and individual capacity, CATHERINE FRIERSON, in her professional and individual capacity, STEVEN LANDT in his professional and individual capacity, and MARY MADDEN in her professional and personal capacity,<br><br>                    Defendants. | COMPLAINT<br><br>Civil Action No. _____ |

1.      Plaintiff Robert Diamond, by and through his attorneys Charny & Wheeler P.C., brings this Complaint and in support states as follows.

## NATURE OF THE ACTION

2.      This is an action brought by Plaintiff Robert Diamond (Plaintiff) against Defendant Nuvance Health, Defendant Health Quest Systems, Inc., Defendant John Murphy, Defendant Steven Rosenberg, Defendant Catherine Frierson, Defendant Steven Landt and

Defendant Mary Madden, arising out of Plaintiff's termination from employment, the

Defendants' intentional acts interfering with Plaintiff's successor employment, and Defendants

failure to provide certain benefits provided for in ERISA benefit plans.

<u>JURISDICTION AND VENUE</u>

3.      Jurisdiction over Defendants is further to 28 U.S.C. Section 1331, in that Plaintiff

brings claims under a federal statute, the Employee Retirement Income Security Act.

4.      There is jurisdiction over Plaintiff's state law claims under 28 U.S.C. Section

1367.

5.      Venue is proper in this Court in that a substantial part of the underlying events

occurred in this District.

<u>PARTIES</u>

6.      Plaintiff Robert Diamond is an adult male, and until November 1, 2019 was an

employee of Defendant Nuvance.  Plaintiff resides in Newburg, New York.

7.      Defendant Nuvance Health is a New York State Domestic Not-for-Profit

Corporation with its headquarters identified in Lagrangeville, New York, Dutchess County.

8.      Defendant Health Quest Systems, Inc., is and was a New York State Domestic

Not-for-Profit Corporation, with its headquarters identified in Lagrangeville, New York,

Dutchess County.  Defendant Health Quest Systems, Inc. was and is the predecessor entity to

Defendant Nuvance.

9.      As of April 2019 and continuing to date, Defendant Murphy is and was the CEO

of Defendant Nuvance, and as of December 2019 Defendant Murphy is also the President and

CEO of Defendant Nuvance.

10.     Defendant Steven Rosenberg is the Chief Financial Officer of Defendant Nuvance as of April 2019.

11.     Defendant Catherine Frierson for all relevant times was Defendants' Chief Human Resources Officer.

12.     Defendant Steven Landt is a Board Member of Defendant Nuvance.

13.     Defendant Mary Madden is a Board Member of Defendant Nuvance.

<u>FACTUAL ALLEGATIONS</u>

14.     Plaintiff began employment with Defendant Health Quest Systems, Inc. (herein HQ) in 2007 as Senior Vice President Chief Information Officer (herein CIO).

15.     In approximately 2014, Defendant HQ's Chief Executive Officer was terminated and replaced by Defendant Luke McGuiness, who was a retired health system executive from Chicago, Illinois.

16.     Almost immediately after being hired and for approximately one year thereafter, Defendant McGuinness terminated the employment of all of HQ's executive and most facility leadership, and replaced them with his own team from Chicago, Illinois and other locations.

17.     Plaintiff was the only executive who survived this purge.

<u>The A/R Valuation Issue</u>

18.     In the Fall of 2017 Defendant HQ went live with a new patient accounting and billing system, a product from the software provider Cerner.

19.     At about that time, Katherine Bacher had been recently appointed Chief Financial Officer of Health Quest and was designated as the executive over the patient accounting portion of the project.

20.     At the time and continuing to date, Bacher had little or no CFO experience, with no background in revenue cycle management.

21.     Approximately one month after the roll out Plaintiff and the Cerner revenue cycle leaders performing the installation noticed that many claims were showing up in work queues which required the patient accounting staff to investigate each issue.

22.     By needing to focus on this work effort, the patient accounting staff were unable or delayed in following up on other claims to best secure payment in a timely fashion and thereby impacting the valuation of the A/R due to its age.

23.     Upon Plaintiff's review, it was determined that the problem was the result of the claims contract management system issue, incorrectly netting the claims down to expected payment and not the gross accounts receivable.

24.     As part of the aforementioned patient accounting system build, the contract management system build and testing was the sole responsibility of Bacher's revenue cycle team especially since Bacher, unknown to Plaintiff, refused Cerner help in the build of this systems, stating that here staff needed no assistance.

25.     At that time -- late 2017 -- Plaintiff advised Bacher and Robert Friedberg, then President and CEO of Defendant Health Quest about the claims issue and in particular Plaintiff advised Bacher that the claims issue had an appurtenant impact on financial accounting, in that it would create an accounts receivable valuation, due to the aging of claims and related lost collectability, issue for all aspects of financial accounting.

26.     This was, as Plaintiff counseled at the time, a significant financial accounting issue because it would have an impact on the value of the accounts receivable over time, and as

revenue ages it becomes uncollectable.  This in turn would lead to overstating the accounts

receivable value (herein the A/R Valuation Issue) .

27.     In particular at that time (and approximately four times over the next two months)

Plaintiff advised Bacher that her finance team, and in particular the "Revenue Cycle" team,

needed to deal with this putative financial reporting issue and correct the contract management

system which was the source of the issue.

28.     In addition to advising and counseling Bacher about this serious issue, Plaintiff

was also advising then-HQ CEO Robert Friedberg.

29.     Plaintiff had repeated discussions with Friedberg at least weekly and each time

Plaintiff was told that he should address this with Bacher as "this is Katherine's problem she has

to deal with it."

30.     Bacher responded each time it was brought up with no equivocation that this was

none of Plaintiff's business and that Plaintiff should "mind your own business."

31.     Bacher was correct, the A/R Valuation Issue was not within Plaintiff's

responsibilities nor was the management of the contract management system within Plaintiff's

responsibilities.

32.     Plaintiff's duties and responsibilities have nothing to do with financial statements.

33.     The Revenue Cycle and Finance teams are responsible for the A/R Valuation

Issue and the supporting system (contract management) and neither report to Plaintiff.

34.     In or about January 2018 Defendants retained a different and new third party

consultant purportedly to remediate the claims issue, Sandra Beimford.

35.     Beimford did not have the proper credentials or skills to provide the necessary

consultant services.

36.     In fact, conversations had between Cerner revenue cycle leaders and one of their clients who also contracted Sandra Beimford supported the Plaintiff's concerns.  To that point, the Cerner Client terminated Beimford due to incompetence and staff divisiveness.

37.     Once hearing of this, Plaintiff requested that Bacher contact the Cerner client to understand better their concerns and reasons for terminating Beimford's contract termination. Backer refused to make the contact.

38.     Instead of remediating what was obviously a contract management issue, Beimford did the following which made the claims issue significantly worse:

(i)     Beimford, who now managed the revenue cycle staff, refused to allow her staff to work with the Defendants IT staff to complete third party vendor interfaces that are needed to manage various sectors of Accounts Receivable including patient statements, Workman's compensation claims, billing secondary insurances and claim follow up/cash collections;

(ii)     Beimford refused to correct any issues until she "re-architected" the entire process, which Beimford never accomplished or committed herself or her staff to work on;

(ii)     Beimford refused to look at the contract management issue or the build out or 3rd party vendor interfaces, which was the root of the claims issue and A/R Valuation Issue; and

(iii)     Beimford focused on other areas of the revenue cycle that were completely irrelevant to the claims issue and/or A/R Valuation Issue.

39.     During the entire initial period that Beimford was working on the claims issue, she repeatedly told staff, and other consulting staff, that she was "pushing the CFO" to make her a full time employee to be called Vice President of Revenue Cycle.

6

40.     Beimford advised staff, and other consulting staff, that she was refusing to fix the major claims issue and would not work with IT staff on the development of an issues project plan until she was appointed to the Vice President position.

41.     Plaintiff reported to Friedberg throughout this time period (within a month of Biemford's arrival and continuing through her retention and increasing over time) that Biemford was not competent to be performing that remediation and that it was a risk to the Defendants' organization.

42.     Plaintiff continued, throughout Biemford's retention, voiced his concerns that Beimford's unwilliness to address issues, prioritize issue remediation, allowing her staff to engage with IT to complete the 3rd party integration work and contract management issues would have a significant impact on the organization's ability to collect cash, resulting in the A/R Valuation Issue.

43.     During these conversations with Friedberg, Plaintiff would provide examples of Bimeford's incompetence.

44.     In or about April 2018, Plaintiff commissioned Cerner to perform an audit of the top five payors' contracts in the contract system for accuracy.

45.     The audit revealed that there was a one-hundred percent (100%) error rate.

46.     Plaintiff reported the audit results to Friedberg and Plaintiff counseled that Plaintiff should be given responsibility over remediating the claims issue from the IT perspective.

47.     At that time, Robert told Plaintiff to communicate the audit findings to Bacher which he did.  Even after sharing this information, Backer did not focus on this issue and the findings and continued to support Beimford's poor performance.

48.     As a result of Bacher's failure to investigate the contract management finding further, Plaintiff once again contracted Cerner to complete the next five top payer contract reviews and again Cerner found (again)) a one hundred percent (100%) error rate.

49.     With this information in hand, Plaintiff once again presented the finding to Friedberg along with concerns that Bacher still had not engaged in the remediation of findings related to the contract management system.

50.     As part of that conversation, Plaintiff suggested that he be given the ability to manage Beimford to develop an issues project plan to complete the needed interfaces and contract with Cerner to review the remaining payer contracts and remediate identified issues based on the contracts impact on revenue.

51.     At that time, Friedberg instructed Plaintiff to move forward with the above plan.

52.     Unfortunately, however, the above revenue cycle issues had been going on for almost a year, significantly impacting the organization's cash position, ability to collect and A/R Valuation Issue.

53.     As a result of the Plaintiff's expectation that Beimford work with himself and IT staff to finalize an issues project plan, Beimford decided to terminate her agreement with Health Quest.

54.     Within four months, under Plaintiff's management, the above claims issues were remediated.

55.     At the time that the claims issue was resolved, Plaintiff believed and appropriately assumed that the Finance Team had made appropriate adjustments to the balance sheet and reported said adjustments to the Finance Committee of Defendants' Board of Directors which would have in turn ensured timely and accurate reporting of the issues and A/R validation.

56.     Additionally, Plaintiff was under the assumption that the CFO (Bacher) contacted her counter parts at the major insurance companies (payors) to let them know Health Quest was embarking on a new patient accounting system go live and negotiate an expansion of contractual "timely filing" requirements to protect the organization from timely filing denials.

57.     In fact, this typical and expected event when going live with a new system was not done.

58.     Plaintiff had previously advised Bacher to take these steps.

59.     It turns out, Defendant Bacher never fulfilled these basic fiduciary obligations.

                              The Merger and Plaintiff's Promotion

60.     On or about April 1, 2019 Defendant HQ announced that it had merged with Western Connecticut Health Network (WCHN) and created a new entity, Defendant Nuvance Health.

61.     On April 1, 2019 Plaintiff was made the Senior Vice President/Chief Information Officer of the merged entity Defendant Nuvance.

62.     Plaintiff's title is Tier 1 within the leadership of Defendant Nuvance.

63.     At the same time Bacher was demoted to the position of Vice President for Financial Operations and Defendant Steven Rosenberg was name Chief Financial Officer.

64.     At that time in April 2019 Defendant John Murphy became of the Chief Executive Officer of Nuvance.

65.     Defendant Rosenberg became responsible for the Financial Reporting for the new entity Defendant Nuvance.

66.     Defendant Rosenberg failed in that obligation in that from the moment of his arrival in April 2019 to the present, especially in that Defendant Rosenberg took no steps to remediate the A/R/ Valuation Issue.

67.     The new entity, Defendant Nuvance is and was a successor in all regards to Defendant HQ.

68.     Nothing changed about the medical practice itself.  Other than continuing to optimize operations given the efficiencies of merger, the practice was a complete and total successor.

69.     The only change in the operations that were contemplated were expected cost savings from combining the operations of the two organizations.

70.     In particular, at the time of the merger Defendant Nuvance's executive team was instructed by Defendant Nuvance's Board to pull out 72 million dollars from the combined operations in this merger.

71.     Between April and into October 2019, Plaintiff was responsible for multiple large initiatives to support information technology issues including:  (i) correction of the failed EHR (electronic health record) implementation at WCHN along with Cerner contracting issues; and (ii) the merger of the IT and Clinical Engineering departments between HQ and WCHN; (iii) the planning and consolidation of all technologies/staff and EHR's to create a new Nuvance technology structure; and (iv) implementation of a consolidated Enterprise Resource Planning system (herein ERP) to support the newly-consolidated systems, including staff consolidations, vendor renegotiation/terminations and a massive Cerner renegotiation.

72.     Plaintiff was able to pull out savings from his Department.

73.     Plaintiff's charge was to save $17 million in the first three years of the merger. From April to October 2019, Plaintiff was able to secure several million dollars in savings through renegotiations of vendor contracts and consolidation of technologies.

<u>Plaintiff's Termination from Employment</u>

74.     In September 2019 financial audits identified an accounts receivable valuation issue that had never been addressed or corrected by Defendant Rosenberg and Bacher.

75.     Defendant Murphy, Defendant Rosenberg and Bacher committed a serious breach of their fiduciary obligations to Defendant HQ and Defendant Nuvance by failing to address or correct the A/R Valuation Issue.

76.     In early October 2019 Plaintiff received a telephone call from Friedberg and was advised for the first time that the A/R Valuation Issue had occurred.

77.     This was the first time Plaintiff learned that Defendant Rosenburg and Bacher had failed to heed his counsel to adjust for the then-putative A/R Valuation Issue.

78.     Up until that moment, Plaintiff believed that Defendants understood and were following his counsel to adjust for the A/R Valuation Issue as he is not part of the finance committee agenda preparation and nor does he attend that meeting unless invited.

79.     Plaintiff called Defendant Rosenberg that day to understand better the issue raised and to offer his and his staff's commitment to assist in resolving the issue.

80.     During that telephone conversation Defendant Rosenberg stated that "this is not an IT issue, it's a finance issue related to A/R valuation."

81.     Defendants' held a Board Meeting on or about October 29, 2019 to discuss the A/R Valuation Issue.

82.     Plaintiff was not invited to the October 29, 2019 meeting.

83.     Defendant Nuvance's Executive Committee is comprised of, among others, Defendant Steve Landt who is the previous CEO of Central Hudson and Defendant Mary Madden who was at the time on the Board of Directors of Central Hudson.

84.     Upon information and belief, during the course of the October 29, 2019 Board Meeting, Defendant Murphy and Defendant Rosenburg did not take any responsibility for the A/R Valuation Issue.

85.     Upon information and belief, during the course of the October 29, 2019 Board Meeting, Defendant Murphy, Defendant Rosenburg and Defendant Frierson told the Board that the A/R Valuation Issue was caused by and the fault of Plaintiff.

86.     This was false information and Defendant Murphy, Defendant Rosenburg and Defendant Frierson knew it was false information.

87.     Defendant Murphy, Defendant Rosenburg and Defendant Frierson made false publications to the Board of Defendant Nuvance in order to avoid having any blame cast on them for their significant breach of duty to Defendant Nuvance.

88.     Defendant Murphy, Defendant Rosenburg and Defendant Frierson had as an additional malicious motive their efforts to eliminate all leadership from Defendant Health Quest such that these Defendants could control the newly-created entity Defendant Nuvance without interference from former Defendant Healthquest leadership.

89.     Defendant Murphy, Defendant Rosenburg and Defendant Frierson made the false publications to the Board of Defendant Nuvance knowing the publications to be false ad knowing that the false publications would impact Plaintiff's professional standing in his professional community, as well as impact Plaintiff's employment with Defendant Nuvance.

90.     On October 30, 2019 Plaintiff met with Friedberg and one of Defendants' human resource representatives and was summarily terminated from employment.

91.     In response to Plaintiff's explanation for the basis of the discharge, Friedberg stated "you know why this is happening."

92.     During this conversation Friedberg conceded that he had instructed Plaintiff not to engage in remediation of the claims issue and that the A/R Valuation Issue was the result of Defendant Murphy's, Defendant Rosenberg's and Bacher's improper conduct.

93.     At the meeting, Plaintiff was told that information regarding severance, retention bonus and healthcare would be forthcoming.

94.     Over the next weeks Plaintiff made several attempts (by email, text and phone) for updates regarding issues of severance, etc.

95.     At or about that time, Plaintiff received COBRA health insurance continuation coverage notice papers triggered by his termination from employment.

96.     Plaintiff began aggressively looking for a new job to protect his family's financial health as Nuvance was obviously manipulating the situation to their benefit.

97.     Sometime in the first week of November, 2019, Plaintiff received a telephone call from Defendants' Human Resource representative advising that his termination date was November 1, 2019, that his healthcare would terminate effective November 31, 2019, and that Plaintiff would receive COBRA paperwork soon thereafter.

98.     On or about November 18, 2019 Plaintiff received a call from Defendant's Human Resources Department stating that they were calling to re-establish my benefits as my employment status had changed.  Bewildered, Plaintiff asked for more information and was told

that I would be receiving a letter stating my employment status was changed from terminated to "employed on administrative leave."

99.     On November 20, 2019, by letter dated November 18, 2019, Defendants advised Plaintiff that Plaintiff's employment status "is changed from terminated to be placed on a paid administrative leave . . ."

100.     In the letter it also stated that he had to work collaboratively as they investigated the patient accounting issue to better understand the situation.

101.     Approximately three days later, Plaintiff received an email from the firm that Nuvance hired to further investigate the issue.

102.     In response to that email, the Plaintiff expressed to the firm's representative that he would be more than accommodating once Defendant Nuvance provided Plaintiff with an agreed severance and assurance of payment for accrued vacation and retention bonus.

103.     Plaintiff responded in writing to Nuvance that he did not accept the offer of reemployment and that he would accommodate their support of the investigation once he received and they agreed to a fair severance agreement .

### The Central Hudson Job Opportunity

104.     Beginning in September 2019 Plaintiff began receiving calls from a recruiter from a national search firm contracted by Central Hudson regarding the Chief Information Officer position at Central Hudson.

105.     The recruiter advised that Central Hudson was specifically interested in luring Plaintiff to their company.

106.     At that time Plaintiff was not interested in the job and Plaintiff so advised the recruiter.

14

107.    In or about October 2019 Plaintiff sensed the instability within Defendants and decided to investigate the position being pitched by the recruiter.

108.    In or about mid-October 2019, Plaintiff spoke with the recruiter during which time they discussed salary ranges and benefit packages for the position.

109.    To that point, the recruiter communicated Plaintiff's salary expectation back to Central Hudson's leadership and secured an agreement on salary and benefits that Plaintiff felt was fair and equitable.

110.    In or about mid October 2019 Plaintiff was advised by the recruiter that she had secured approval of the salary and benefits package being negotiated.

111.    In or about the third week of October 2019 Plaintiff was advised that he would be meeting with the CEO of Central Hudson regarding his hiring as CIO for Central Hudson.

112.    On or about November 5, 2019 Plaintiff spoke with the recruiter and the recruiter reported that the CEO of Central Hudson was informed that Plaintiff had been terminated from Defendant Nuvance due to misconduct related to the failed revenue cycle implementation.

113.    The recruiter reported to Plaintiff that she and Central Hudson had been advised of certain misconduct by Plaintiff at Defendant Nuvance and that as a result Central Hudson was withdrawing its solicitation of employment.

114.    Upon information and belief, on or about November 4, 2019, Defendant Landt and Defendant Madden made statements to the CEO of Central Hudson that Plaintiff had engaged in misconduct while he was employed by Defendant Nuvance.

115.    Upon information and belief, on or about November 4, 2019, Defendant Landt and Defendant Madden stated to the CEO of Central Hudson that Plaintiff had engaged in financial misconduct which led to the A/R Valuation Issue at Defendant Nuvance.

15

116.    Upon information and belief, Defendant Landt and Defendant Madden knew these statements to be false.

117.    Defendant Landt and Defendant Madden made these statements with the specific purpose of interfering with Plaintiff's employment opportunities with Central Hudson.

<u>The Retention Policy and Severance Policy</u>

118.    In or about August 2018 Plaintiff and Defendants executed a Retention Bonus Agreement.

119.    The Retention Bonus Agreement provides for the following:

> If the Executive remains employed with Health Quest or the New Health System through the second annual anniversary of closing of the transaction forming the New Health System (the "First Payment Vesting Date"), Health Quest shall pay the Executive a retention bonus in the amount of $100,000 (the "First Retention Bonus"). If the Executive Remains employed as of the third annual anniversary of the closing of the transaction  forming the New Health System (the "Second Payment Vesting Date," and with the First  Payment Vesting Date, the "Payment Vesting Dates"), Health Quest shall pay the Executive an additional retention bonus in the amount of $100,000 (the "Second Retention Bonus", and with the First Retention Bonus, the "Retention Bonuses"). Each installment of the Retention Bonuses shall be paid in a single lump sum payment (less all applicable federal, state and local income and employment tax withholdings) no later than thirty (30) days after the  applicable  Payment Vesting Date. If before a Payment Vesting Date (i) the Executive's employment is terminated by Health Quest due to the elimination of his or her position, (ii) the Executive's employment is terminated by Health Quest without Good Cause,  (iii) the Executive voluntarily terminates his or her employment with Health Quest for Good Reason, (iv) the Executive dies; or (v) the Executive's employment is terminated as the result of his or her  Disability  (each  of  the foregoing events a "Partial Vesting Triggering Event"), the Executive shall partially vest in his or her Retention Bonuses, and Health Quest shall pay to the Executive a pro-rated portion of the Retention Bonuses. The amount of such partially vested, pro-rated Retention Bonuses  shall equal the full amount of the Retention Bonuses that remains unpaid on the Partial Vesting Triggering Event multiplied by a fraction the numerator of which is the number  of  days during  the Term prior

to the date of the Partial Vesting Triggering Event  and the
denominator  of which is the number of days in the Term. The pro-
rated Retention Bonus shall be paid in a single lump sum payment
(less all applicable federal, state and local income and employment
tax withholdings) no later than thirty (30) days after the date  of
the  Partial  Vesting  Triggering Event.

120.    Plaintiff was terminated on November 1, 2019 without good cause.

121.    Plaintiff is entitled to a payment of $29,274 in unpaid retention bonus.

122.    In or about May 2019 Plaintiff and Defendants entered into a "Severance Plan for
Incentive Eligible Employees" (the Severance Plan).

123.    The Severance Plan provides for Plaintiff to receive one year of base salary
continuation upon separation from employment with Defendant Nuvance without good cause
until such time as Plaintiff secures successor employment.

124.    As such, Plaintiff is entitled to Severance Plan benefits of one year of base salary
continuation until such time as Plaintiff secures successor employment.

125.    On or about November 7, 2019, Plaintiff made an application and demand for the
Severance Plan benefits and the Retention Bonus benefits to Defendant Nuvance's Chief Human
Resources Officer.

126.    Over the course of the next four weeks Plaintiff received a series of responses
from Defendant Nuvance that they had not yet decided whether or not to pay the benefits.

127.    In or about January 2020 Plaintiff was advise that Plaintiff would not be receiving
either the Retention Bonus or the Severance Plan benefits.

128.    Plaintiff was never given the benefits.

129.    Plaintiff received COBRA health insurance benefit continuation from Defendant
Nuvance.

Plaintiff's Successor Employment

130.    Plaintiff secured successor employment starting on December 16, 2019.

131.    The successor position was not ideal for Plaintiff and caused him and his family significant stress and hardship.

132.    For example, the new position required a commute to Buffalo, New York from Plaintiff's home in Newburg, New York.

133.    The new position pays less compensation.

134.    Plaintiff is now required to pay for commuting to / housing in Buffalo, New York.

135.    Plaintiff is now required to be away from his family for long stretches at a time.

136.    The successor employment is far more stressful a position in terms of workload and problem-solving.

137.    Plaintiff has lost value in his opportunity to secure vesting and therefore increased retirement benefits at Defendant Nuvance.

138.    The retirement benefits are significantly less at the successor position than with Defendant Nuvance.

139.    The value of such lost retirement compensation opportunities is approximately $200,000.

140.    In mid January 2020, Plaintiff received communication from Defendant stating that because Plaintiff had secured successor employment Defendant Nuvance was once again attempting to after-the-fact change Plaintiff's status from terminated to voluntary quit.

141.    Defendants' conduct has been widely communicated within his professional community.

142.    Plaintiff's reputation within the business community in the Hudson Valley has been irrepealably disparaged and harmed

143.    The statewide, regional and national healthcare industry is very close nit.  News of the situation has permeated beyond the Hudson Valley and as a result, Plaintiff will need to explain this situation as he attempts to secure employment in the future.

<u>FIRST CAUSE OF ACTION</u>

<u>ERISA -- DENIAL OF BENEFITS</u>

144.    Plaintiff restates the foregoing allegations.

145.    By the foregoing Defendants denied Plaintiff certain benefits including Retention Policy benefits and Severance Policy benefits protected by the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 <u>et seq.</u>

146.    Defendants' failure to pay these ERISA-protected benefits was without cause and violated the terms of the two Plans.

147.    Defendants' failure to pay these ERISA-protected benefits without substantial evidence and without legal support.

148.    Defendants failure to pay these ERISA-protected benefits was arbitrary and without support, and contrary to the plain language of the Plan documents.

149.    Plaintiff is entitled to actual, compensatory, liquidated, statutory and punitive damages, as well as attorneys fees and costs in bringing this suit.

<u>SECOND CAUSE OF ACTION</u>

<u>TORTIOUS INTERFERENCE WITH EMPLOYMENT</u>

150.    Plaintiff restates the foregoing allegations.

151.    Plaintiff had a business relationship with Defendant Nuvance.

152.    Defendants interfered with those business relations.

153.    Defendants acted with the sole purpose of harming Plaintiff.

154.    Defendants used dishonest, unfair and improper means to interfere with Plaintiff's

employment relations with Nuvance.

155.    Plaintiff's relationship with Nuvance was injured as a result.

156.    Plaintiff is entitled to damages for said conduct.

THIRD CAUSE OF ACTION

TORTIOUS INTERFERENCE WITH
PROSPECTIVE CONTRACTUAL RELATIONS

157.    Plaintiff restates the foregoing allegations.

158.    By the foregoing conduct Defendants have inhibited Plaintiff from obtaining

income from prospective contractual relations.

159.    Defendants' used wrongful means to interfere with Plaintiffs' contractual relations

with Central Hudson.

160.    Defendants engaged in an independent tort in interfering with Plaintiff's

prospective employment relations with Central Hudson, to wit, Defendants engaged in the

independent tort of defamation per se.

161.    Plaintiff is entitled to actual, compensatory, liquidated, statutory and punitive

damages, as well as attorneys fees and costs in bringing this suit.

FOURTH CAUSE OF ACTION

DEFAMATION

162.    Plaintiff restates the foregoing allegations.

163.    By the foregoing conduct Defendants have committed defamation per se.

164.     Defendants' publications caused harm to Plaintiff's standing within his professional community.

165.     Defendants' statements were false and Defendants knew the publications were false at the time they were published by Defendants.

166.     Plaintiff is entitled to actual, compensatory and punitive damages arising out of Defendants' defamatory publications.

<u>FIFTH CAUSE OF ACTION</u>

<u>BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING</u>

167.     Plaintiff restates the foregoing allegations.

168.     Defendants owed Plaintiff a duty to act in good faith and conduct fair dealing.

169.     Defendants breached that duty.

170.     Defendants' breach proximately caused Plaintiff damages.

<u>SIXTH CAUSE OF ACTION</u>

<u>TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE</u>

171.     Plaintiff restates the foregoing allegations.

172.     Plaintiff had a business relationship with a third party.

173.     Defendants knew about the business relationship with a third party and intentionally interfered with it.

174.     Defendants acted solely out of malice, or used dishonest, unfair, or improper means.

175.     Defendants' interference caused injury to the relationship.

<u>SEVENTH CAUSE OF ACTION</u>

<u>PRIMA FACIE TORT</u>

176.   Plaintiff restates the foregoing allegations.

177.   By the foregoing Defendants committed prima facie tort against Plaintiff.

178.   Plaintiff is entitled to actual, compensatory and punitive damages.

<u>EIGHTH CAUSE OF ACTION</u>

<u>INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS</u>

179.   Plaintiff restates the foregoing allegations.

180.   Defendants intentionally inflicted emotional distress on Plaintiff.

181.   Defendants engaged in extreme and outrageous conduct.

182.   Defendants engaged in such conduct with the intent to cause or the disregard of a substantial likelihood of causing, severe emotional distress to Plaintiff.

183.   There is a causal connection between Defendants' conduct, the intent and the harm cause.

184.   Plaintiff suffered severe emotional distress as a result of Defendants' conduct.

<u>REQUEST FOR RELIEF</u>

185.   Plaintiff seeks the following relief:

(i)     Actual damages;

(ii)    Compensatory damages;

(iii)   Statutory damages;

(iv)    Liquidated damages;

        (v)      Punitive damages;

        (vi)     An Order of the Court prohibiting any further defamation of

              Plaintiff; and

        (vii)    Attorneys fees and costs.

186.    Plaintiff seeks an Order of this Court that Defendants should cease and desist from any further violative conduct.

187.    Plaintiff seeks pre- and post-judgment interest.

188.    Plaintiff seeks such other relief as allowed by the law.

189.    Plaintiff seeks such other relief as the Court deems fair and just.

<u>JURY TRIAL DEMANDED</u>

190.    Plaintiff requests a trial by jury.

Dated: Rhinebeck, New York
       June 17, 2020

                                  Respectfully submitted:

                                  Nathaniel K. Charny
                                  Charny & Wheeler P.C.
                                  9 West Market Street
                                  Rhinebeck, New York  12572
                                  ncharny@charnywheeler.com
                                  (845) 876-7500

                                  Attorneys for Plaintiff